# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Joseph Masanz, | Civil No. 09-1145 (JNE/SER) |
|        Plaintiff, | |
| v. | REPORT AND<br>RECOMMENDATION |
| Michael J. Astrue, Commissioner<br>of Social Security, | |
|        Defendant. | |

_____

Jennifer G. Mrozik, Attorney at Law, 1781 West City Road B, Roseville, Minnesota 55113, for Plaintiff.

Lonnie F. Bryan, Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

_____

STEVEN E. RAU, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Joseph Masanz seeks judicial review of the final decision of the Commissioner of Social Security (Commissioner), who denied Plaintiff's application for disability insurance benefits. Both parties have filed motions for summary judgment (Docket Nos. 12 and 15) and the motions have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and the District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's motion (Docket No. 12) be denied and Defendant's motion (Docket No. 15) be granted.

# I. BACKGROUND

## A. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on November 25, 2003 (Tr. 95-97), which was denied on May 12, 2004. (Id. at 73-77.) He did not seek further administrative review of this determination. (Id. at 16.) Subsequently, on May 23, 2005, Plaintiff protectively filed an application for a period of disability and disability insurance benefits, alleging disability beginning May 23, 2002. (Id. at 90-92.) After his application was denied initially and upon reconsideration (Id. at 59-62, 64-69, 73-77), he requested a hearing before an Administrative Law Judge (ALJ). (Id. at 58.) Plaintiff, his attorney, and an impartial vocational expert, Julie Harren, attended the hearing on December 7, 2007 before ALJ David K. Gatto, at which both Plaintiff and Ms. Harren testified. (Id. at 588-608.) ALJ Gatto issued an unfavorable decision on March 18, 2008. (Id. at 13, 27-28.) The Appeals Council denied Plaintiff's request for review on March 13, 2009. (Id. at 4-6), making the ALJ's decision the final decision for purposes of judicial review. See 42 U.S.C. § 405(g); Clay v. Barnhart, 417 F.3d 922, 928 (8th Cir. 2005).

## B. MEDICAL EVIDENCE OF RECORD

Plaintiff was born on August 4, 1950, making him 57 years old at the time of the ALJ's decision. He studied sociology at the University of Minnesota, became a registered nurse and obtained a master's degree in public health from Johns Hopkins University. (Tr. 330-331.) Plaintiff worked as a research nurse in the Neurosurgery Department at Hennepin County Medical Center. (Id. at 310). He was married in 1989 and has one son, but Plaintiff and his wife became estranged and separated in approximately 2006. (Id. at 331, 558, 564.)

On May 23, 2002, Plaintiff fell from a ten-foot tall ladder while working on his house. (Id. at 310-12.)  At the time, Plaintiff was employed as a research nurse at Hennepin County Medical Center.  (Id. at 310.)   After initial intensive care treatment at Hennepin County Medical Center, Plaintiff was hospitalized for several days, then transferred on an inpatient basis to the hospital's rehabilitation facility, the Knapp Rehabilitation Center.  (Id. at 310-16.)  Plaintiff was diagnosed with a closed head traumatic brain injury ("TBI").  (Id. at 310-13.)  In addition, Plaintiff's discharge summary reports findings of hypothyroidism, depression, posttraumatic (short-term) amnesia, cognitive deficits, executive dysfunction, perseveration, difficulty with multi-step directions, poor recall and poor attention to detail. (Id.)  While obtaining treatment at the Knapp Rehabilitation Center in the days following his injury,  Plaintiff was found to have impairments in verbal and visual reasoning, visual planning, construction and memory. (Id. at 330-333.)  Plaintiff's medical record, discussed in detail below, documents his treatment related to TBI and other mental health issues.

On June 5, 2002, Plaintiff had his first appointment on an outpatient basis with Dr. James B. Thomson, the senior clinical neuropsychologist at the Knapp Rehabilitation Center.  Dr. Thomson reported that the "prospect of impaired stamina, endurance, and mental concentration, especially as the workday progresses, is a major concern." (Id. at 336.)   Apparently Plaintiff had tried to return to his research work at Hennepin County Medical Center, or contemplated his return, and reported feeling very fatigued in the afternoons.  Plaintiff had proposed to his supervisor the possibility of working in the mornings, going home in the afternoons, and returning to work in the evenings, however his supervisor rejected that proposal. (Id.)  In a follow-up appointment on June 7, 2002, Dr. Thomson recorded improvement in occupational

therapy and speech pathology. (Id. at 335.) Although Plaintiff continued to feel fatigued, he appeared fluent and organized in his interview with Dr. Thomson. (Id.)

Dr. Thomson produced a neurological report on June 14, 2002. In this report he reviewed a neuropsychological evaluation conducted on May 24, 2002 by Dr. David Tupper, who found Plaintiff to have moderate memory and executive dysfunction, consistent with mild TBI and attention impairments. (Id. at 330-333.) The record indicates that on the days of neurological testing, June 12, 2002 and June 14, 2002, Plaintiff was pleasant, cooperative, focused, and fluent with rare word substitution. He displayed a good sense of humor and good effort on tests. On an intelligence test, Plaintiff showed improved reasoning ability despite continued impairment in auditory concentration. Recall for visual and verbal material also improved, although Plaintiff continued to have difficulty with visual attention. (Id.) Dr. Thomson concluded that the test results showed "very significant improvement in most areas," id. at 332, and recommended that Plaintiff return to work half time, if he was ready, gradually building up to his previous work duties in four to twelve weeks. (Id. at 333.) On a follow-up visit with Dr. Thompson in July 2002, Plaintiff stated that he was unable to manage his workload after returning to his old job, finding himself confused and overwhelmed by his work. (Id. at 327.) Plaintiff also experienced some depersonalization, panic, and loss of control, while his stamina and energy were also limited. (Id.)

On June 28, 2002, Plaintiff met with Dr. John F. Rotilie of Aspen Medical Group, who found no physical problems associated with Plaintiff's TBI, but inferred internal injuries. (Id. at 228-229.) He also noted Plaintiff's history of Prozac use, initially prescribed for depression, and Synthroid for hypothyroidism. Dr. Rotilie wrote, "He is trying to go back to work. Has tried a half-day for a week, but was quite exhausted. He does mainly office, mental kinds of work. He is

gradually clearing mentally." (Id.) Plaintiff reported "some memory defects, some depersonalizations, some déjà vu, and difficulty with mental focusing," although these issues were improving. Dr. Rotilie did not detect any overt confusion or psychosis. (Id.) On the physical exam, Plaintiff was alert, not stressed, but took a little time to focus his thoughts and verbalize answers. He followed simple commands well. Dr. Rotilie reported that Plaintiff felt a sense of irritability when sensory inputs were strong and Plaintiff questioned whether Prozac was augmenting his low tolerance. Therefore, Dr. Rotilie decreased Plaintiff's Prozac dose to 20 mg per day. (Id.)

At Hennepin County Medical Center, Plaintiff met with staff physician Dr. John Bowar on July 1, 2002 for a rehabilitation and surgery consultation. A CT scan was negative for bleeding, but Plaintiff "obviously had some memory and mood changes." (Id. at 315.) Dr. Bowar also prescribed Ambien to help with Plaintiff's sleeping difficulties and adjusted his Prozac prescription to address complaints of fatigue. (Id.) He also noted that Plaintiff was struggling to return to work and had difficulty focusing and concentrating. (Id.)

On July 8, 2002, Plaintiff presented to his psychological counselor, Dr. Shepherd Myers, for a psychological intake assessment. Plaintiff complained of short-term memory problems and overstimulation. (Id. at 304-306.) Dr. Myers indicated that Plaintiff's symptoms included depressed mood, irritability, anhedonia, decreased sexual interest, feelings of worthlessness, diminished memory and concentration, middle insomnia, and occasional tearfulness. (Id.) Plaintiff reported that he became overwhelmed in highly stimulating environments. Dr. Myers also noted that Plaintiff had been withdrawing from social and ordinary activities, although he had several friends. Mentally, Plaintiff appeared open and talkative with a slightly constricted affect. His mood was slightly depressed, and all other communication was normal. (Id.) Dr.

Myers noted that Plaintiff had a history of anxiety and "difficulty accessing and adequately expressing anger." (Id.) Using the Global Assessment of Functioning Scale ("GAF"), which subjectively measures the social, occupational and psychological functioning of adults on a scale of 0 to 100, Plaintiff's GAF score was 50, indicating "severe symptoms affecting his Global Functioning." (Id.)

On July 16, 2002, Plaintiff met again with neuropsychologist Dr. Thomson, with whom he discussed his employment as a research nurse. (Id. at 319.) Plaintiff stated he was very depressed and discouraged. (Id.) Dr. Thomson observed that Plaintiff appeared to be suffering from a "catastrophic reaction" to the consequences of his brain injury. (Id.) He advised that Plaintiff be evaluated weekly, as appropriate, with the goal of returning to work as he is able. (Id.)

On July 17, 2002, Plaintiff's wife brought him to United Hospital's emergency room on the recommendation of Dr. Rotilie. (Id. at 360.) Plaintiff reported suicidal thoughts of jumping off a bridge and homicidal thoughts directed toward former coworkers in Wisconsin. The examining physician also indicated that Plaintiff had experienced a few episodes of depersonalization, was tangential and easily distracted, but easily redirected and conversational. (Id.) Plaintiff was diagnosed with suicidal ideation and depression and was admitted to the hospital due to the ongoing risk of suicide. (Id. at 351.) Reports from Dr. Ramesh Sairam on the following day show that Plaintiff appeared calmer, but was still experiencing anxiety and dysphoria, due to his cognitive difficulty and its impact on his ability to work. (Id. at 354-357.) Plaintiff was also deemed intolerant of excessive environmental stimuli. Dr. Sairam assigned a GAF of 45 and diagnosed a cognitive disorder due to closed head injury and adjustment disorder with mixed depression and anxiety. (Id.)

Plaintiff was discharged eight days later on July 25, 2002 with improved cognitive function and energy levels. (Id. at 352.) He was prescribed Wellbutrin for his depression, along with the previously-prescribed Prozac. (Id.) Plaintiff, who had been assigned a GAF score of 40 on admission, was assigned a score of 55 when discharged. (Id.) His discharge summary also reported a reduced tendency to ruminate, lifting of suicidal thoughts, and the establishment of small goals. (Id. at 349.) In a treatment plan that was prepared on the day of his hospital discharge, the treating physician recommended that Plaintiff attend day treatment five days a week, take medication as prescribed, receive instruction in mindfulness, improve communication skills and work with vocational rehabilitation, as appropriate. (Id. at 348.)

At a follow-up psychotherapy appointment on July 31, 2002, Dr. Myers reported that Plaintiff no longer expressed suicidal ideation. Plaintiff felt that he greatly benefitted from his recent hospitalization. (Id. at 303.) A week later on August 7, 2002, Dr. Myers discussed with Plaintiff the interrelated issues of repression of anger, sadness and depression. Plaintiff reported that he could "no longer cope with his feelings through rationalization after his head trauma." (Id. at 300-301.) He felt that he had fewer outlets, due to reduced exercise, and repressed anger and sadness. (Id.)

At an appointment with neuropsychologist Dr. Thomson on August 13, 2002, Dr. Thomson noted that Plaintiff appeared to be benefitting from group therapy and psychological services. (Id. at 318.) He seemed calm, focused, optimistic, and philosophical. Plaintiff stated "that he had to hit bottom before getting better." (Id.) During this time, Plaintiff also continued to meet with Dr. Myers (id. at 300) and Dr. Scott Yarosh (id. at 345) for follow-up care.

Treatment notes from Dr. Myers on August 28, 2002 indicate that he received a call from Plaintiff's day treatment therapist at United Hospital, who expressed concerns about an

upcoming meeting between Plaintiff and his work supervisor in which Plaintiff feared that he would be terminated. In addition, Plaintiff was concerned about the state of his marriage. (Id. at 297-298.) At the appointment with Dr. Myers, Plaintiff reported that his mood was generally stable, and Dr. Myers concluded that Plaintiff appeared to be able to handle the upcoming employment meeting. (Id.) Dr. Myers recommended seeing a different therapist for marital therapy. (Id.)

On August 29, 2002, Plaintiff indicated that he suffered from problems involving anger and shame in terms of his coping skills, and Dr. Thomson observed that Plaintiff appeared to be calm, logical, rational, and insightful. (Id. at 321.) Dr. Thomson and Plaintiff discussed Plaintiff's likelihood of success in returning to work involving duties similar to his previous job. (Id.)

Therapy treatment notes from the fall of 2002 indicate that Plaintiff was less worried, with "only very fleeing thoughts of suicide," and later, "no suicidal ideation." (Id. at 489.) While Plaintiff reported some anxiety, particularly concerning employment, he also reported an improved mood. (Id. at 490.) Dr. Thomson noted Plaintiff's anxiety and distraction probably influenced assessment results for his capability of returning to work. (Id. at 323.) Plaintiff's marital difficulties continued. (Id.) In addition, Plaintiff lost his job on October 3, 2002, and Dr. Thomson noted on that day that Plaintiff was experiencing heavy stress, difficulty sleeping, and a "distracted mental state." (Id. at 322.) Accordingly, Dr. Thomson abandoned plans that day to administer follow-up assessments of Plaintiff's recovery from the brain injury. (Id.)

To address their marital problems, Plaintiff and his wife began marriage therapy with social worker Neddy Thompson in the fall of 2002. (Id. at 284-286.) His mental health intake

indicated that while Plaintiff was open and cooperative, he did not always track the conversation and appeared anxious. (Id.)

Progress notes from Dr. Yarosh dated October 24, 2002 state, "From a mood perspective, I do not see him as disabled and he's certainly not suicidal, psychotic, demented, or delirious." (Id. at 343.)  He also opined that "this is not an overt issue of disability but rather a mismatch in terms of job suitability.  It sounds as though he's in a situation that may not be optimal for him, which is technically different than a medical disability."  (Id.)

Also on October 24, 2002, Dr. James Thomson issued a neuropsychological report at the conclusion of Plaintiff's neuropsychological rehabilitation from the Knapp Rehabilitation Center. (Id. at 316-317.)  Plaintiff reported difficulty with multitasking and focusing in crowded, noisy places, becoming "somewhat scattered."  (Id. at 316.)   He appeared calm, confident, pleasant, cooperative, well-groomed, focused, articulate, with a good sense of humor, realistic, but also relatively optimistic in the session. (Id.)  From a battery of neuropsychological tests, Dr. Thomson concluded that Plaintiff appeared capable of a high level of functioning.  (Id. at 317.) .  Dr. Thomson also wrote that Plaintiff had "good recovery from his mild traumatic brain injury and good recovery from his severe depression and anxiety." (Id.)  He indicated that Plaintiff appeared ready to return to work at the level of his previous training, but acknowledged that Plaintiff was concerned about his ability to focus in demanding or overstimulating situations. "Given control over his workplace and duties, he is likely to be as capable of his work duties as he had been before his injury."  (Id.)  Dr. Thomson noted that Plaintiff agreed with this assessment.  (Id.)

At a final marriage counseling session with Neddy Thompson in November 2002, Plaintiff's wife stated that she was "furious" that Plaintiff's private disability benefits had been

cut off, which was one of many areas of conflict identified by the couple. (Id. at 283.) Despite the report that Plaintiff's benefits had been discontinued, a medical entry from January 6, 2003 by Dr. John Rotilie indicates that Plaintiff was "still on partial disability." (Id. at 223.) Dr. Rotilie also noted "depressive symptoms, and some memory difficulty, occasional minor gait disturbance" (Id.) Despite these symptoms, Dr. Rotilie noted that Plaintiff was alert and oriented. Plaintiff reported that he was active, riding his bike, and had few physical problems. (Id.)

On January 7, 2003, Plaintiff had his first appointment with his treating neurologist, Dr. Charles F. Ormiston. He noted that Plaintiff had tried to return to work without success and felt decreased physical and mental stamina. (Id. at 214-215.) Dr. Ormiston prescribed Adderall, in addition to Prozac and Wellbutrin. (Id.) He indicated that Plaintiff's history was consistent with TBI and that plans regarding Plaintiff's future ability to work were dependent on how he responded to interventions. (Id. at 215.) Also in the winter of 2003, Plaintiff began taking nursing refresher courses (Id. at 483), and participated in a church group, a men's group and volunteer activities. (Id. at 274.)

By March 2003, Plaintiff had completed his nursing refresher courses, and he met with Dr. Myers to discuss anxiety problems. (Id. at 273-274. Plaintiff had a follow-up appointment with Dr. Ormiston during this time, at which Plaintiff reported improvement, especially when working in quiet surroundings without distraction. (Id. at 213.)

During sessions with Dr. Myers in the spring of 2003, Dr. Myers indicated that Plaintiff displayed excessive levels of cynicism and negativity, triggering his depression. (Id. at 271-272.) Dr. Myers suggested that Plaintiff resisted structure and possibly had attention deficit disorder ("ADD"). (Id.) Plaintiff also reported discussions with his wife concerning possible divorce.

(Id. at 270-271.)  Dr. Myers noted that Plaintiff's job search was still inactive and he was not completing essential tasks. (Id.)  Plaintiff reported improved mood, but mild symptoms of depression remained. He had a "particular difficulty with motivation." (Id.)  On April 22, 2003, at a session with Dr. Yarosh, the doctor noted that Plaintiff was still not working, and had many complaints about life:  "He continues to [be] overtly passive and victimizing," his mood was reported to be depressed and anxious, his judgment was poor, and his insight was limited, although his thought form was logical and goal-directed.  (Id. at 342.)  On May 5, 2003 at a follow-up appointment with Dr. Ormiston, Plaintiff reported he was "working on getting back to work." (Id. at 212.) He indicated that he had a job coach and was looking for part-time jobs with limited multitasking. He also reported memory problems, needed to write things down, had poor endurance, and was overwhelmed by background noise or sensory stimulation. (Id.)   In May 2003, following a counseling session with Dr. Myers, the doctor opined that a sense of fear was keeping Plaintiff from networking and applying for jobs.  (Id. at 268-269.)  Plaintiff also had "great difficulty with staying focused and persisting in important tasks," and was not sufficiently applying for jobs. (Id.)

In a session with Dr. Myers on May 14, 2003, Plaintiff was reported to be extremely tangential. (Id. at 265-266.)   Dr. Myers discussed a Courage Center occupational evaluation, in which one evaluator recommended "very part-time" volunteer work.   (Id.)  Plaintiff was reported to display "poor detail description, becoming confused and overwhelmed when dealing with multiple tasks, and poor short-term memory." (Id.) Dr. Meyers thought that returning to work would benefit Plaintiff's mental status. (Id. at 266.)  On July 1, 2003, Plaintiff began a volunteer job with the Red Cross, and reported that his mood was becoming more stable. (Id. at 256.)

During appointments in the summer of 2003 when Plaintiff was volunteering, he reported to be more fatigued and had "much more trouble keeping information together." (<u>Id.</u> at 211.) He had difficulty using his workplace's database and felt incapable. He reported increased strain with his wife, who complained of having to shoulder the burden of financial responsibilities. Dr. Ormiston increased Plaintiff's morning Adderall dose. (<u>Id.</u>) Plaintiff's depression, however, was categorized as mild. (<u>Id.</u> at 256.) By late July 2003, Plaintiff was volunteering up to 30 hours per week with the Red Cross. (<u>Id.</u> at 341.) Plaintiff reported that he felt very tired after four-hour work days, and he was struggling with organization. (<u>Id.</u> at 260.) Medical entries reflect that his organization and fatigue problems continued into the fall. (<u>Id.</u> at 255.) On October 1, 2003, Dr. Ormiston described Plaintiff's continuing complaints of fatigue and distractibility as a "serious endurance issue." (<u>Id.</u> at 210.) Plaintiff also said that after four hours of wakefulness, he needed two to three hours of sleep. (<u>Id.</u>)

On a recommendation from Dr. Ormiston, Plaintiff met with Dr. Norman J. Cohen, a neuropsychologist, in October 2003, and underwent a neuropsychological evaluation that revealed mild cognitive deficits in speed of processing and executive abilities and more significant deficits in visual memory. (<u>Id.</u> at 401, 403-409.) During testing, Plaintiff was cooperative, displayed good verbal ability, tended to talk himself through the tasks, and expressed his desire to do well in testing and his frustration at his inability to perform at pre-morbid levels. Dr. Cohen noted that Plaintiff was notably dysphoric and teary when discussing changes in his life since the accident. (<u>Id.</u>) Plaintiff reported that his mood was currently "much more upbeat" than in the summer of 2002, which he attributed to group and individual psychotherapy. (<u>Id.</u> at 407.)

Although testing showed that Plaintiff's full-scale IQ score was in the 91st percentile, many scores in attention, executive skills, and speed of processing fell around the 50th percentile, which Dr. Cohen described as functional, but "likely notably below those present before the fall." (Id.) Dr. Cohen reported that Plaintiff's problem-solving skills were good, but he displayed a specific deficiency in processing speed and attentional abilities, and more significant deficits in visual memory. (Id. at 404.) Dr. Cohen recommended that Plaintiff return to work in a job that did not require speedy performance in high-level decision making. (Id. at 408.) Dr. Cohen opined that a successful return to work could be psychotherapeutic, but if Plaintiff considered a new position a demotion, it could be psychotherapeutically stressful. Dr. Cohen stated that Plaintiff would not likely succeed in the kinds of jobs that he held before the TBI. (Id.) He recommended additional cognitive remediation and a job coach. (Id.)

On October 15, 2003, Plaintiff reported to Dr. Myers that he felt fatigue following the 3-hour assessment on October 14, 2003 with Dr. Cohen at the Courage Center. (Id. at 251.) He was volunteering 16-20 hours per week at the Red Cross (Id.), but he feared being fired if he were to work as a paid employee. (Id. at 248-249.) Dr. Myers noted "continued problems coping with his traumatic brain injury, dealing with family issues, and managing stress. He continues to display moderate symptoms of depression, which likely interact with his traumatic brain injury making it difficult to progress." (Id.) Dr. Myers diagnosed major depressive disorder and dementia secondary to head injury. (Id.)

Plaintiff continued to meet with Dr. Myers in November and December. They discussed his difficulties coping with marital problems, frustration, fatigue, and distractibility. (Id. at 244, 246.) Dr. Myers categorized Plaintiff's depression as mild. (Id. at 242.) In a session with Dr. Ormiston in December 2003, Dr. Ormiston voiced his agreement with Dr. Cohen's previous

assessments in the fall, which noted a decline from Plaintiff's previous level of function. (<u>Id.</u> at 209.) Dr. Ormiston stated that Plaintiff "can work, but we have to presume that he will not be able to work at the previous levels." (<u>Id.</u>)

In early 2004, Plaintiff continued to treat with Dr. Yarosh (<u>see</u> <u>id.</u> at 229), Dr. Rotilie (<u>see</u> <u>id.</u> at 218-19) and Dr. Myers (<u>see</u> <u>id.</u> at 239.)  Dr. Myers noted at this time that Plaintiff made lists but did not always follow them, had inconsistent bedtimes, was not proactive in his job search, frequently arrived late to work, and did not make sufficient progress on developing an organizational system. (<u>Id.</u> at 239.)  In February 2004, Plaintiff informed Dr. Meyers that he had begun a new job filling out phone surveys, but the scheduling was irregular. (<u>Id.</u> at 238.)  Dr. Myers noted Plaintiff's improved mood, bright affect, and increased ability to compensate for deficits. (<u>Id.</u>) On March 10, 2004, Dr. Myers remarked upon Plaintiff's progress, stating that Plaintiff was "doing well in his 2 part-time positions. He was making progress being more organized." (<u>Id.</u> at 237.)  On May 5, 2004, Dr. Myers reported that Plaintiff's wife had expressed concern that his expressions of anger had progressively worsened since his brain injury. (<u>Id.</u> at 443.)  Plaintiff's wife reported that Plaintiff was "virtually paralyzed by anxiety." (<u>Id.</u> at 444.)

Also in May 2004, Dr. Thomas L. Kuhlman, a state agency medical consultant, completed the Social Security Administration's Psychiatric Review Technique Form and the Mental Residual Functional Capacity Assessment. (<u>Id.</u> at 369-371, 376-377, 379, & 386.) On the Psychiatric Review Technique Form, Dr. Kuhlman indicated that Plaintiff's organic mental disorder and affective disorder caused him to have mild to moderate limitations in three areas: restriction of activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace. (<u>Id.</u> at 376-377, 379, & 386.)  He also recorded that Plaintiff had disturbance in mood and possible loss of measured intellectual

ability of at least 15 IQ points from pre-morbid levels associated with a dysfunction of the brain, consistent with Listing 12.02 of the Social Security Administration's Listing of Impairments. (Id.)   As for Plaintiff's mood, Dr. Kuhlman  noted psychomotor agitation, decreased energy, difficulty concentrating or thinking and thoughts of suicide. (Id.)

On the Mental Residual Functional Capacity Assessment (Id. at 369-72), Dr. Kuhlman found Plaintiff to be moderately limited in the ability to interact appropriately with the general public and to respond appropriately to changes in the work setting.  He also found Plaintiff to be not significantly limited/moderately limited in the following areas: (1)  the ability to understand and remember detailed instructions, (2) the ability to carry out detailed instructions, (3) the ability to maintain attention and concentration for extended periods, and (4) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id. at 369-70.)   Dr. Kuhlman concluded that some mild to moderate residual cognitive deficits had resulted from the Plaintiff's TBI, and while these deficits precluded Plaintiff's previous work, they were not severe enough to preclude all work. (Id. at 371.)   Dr. Kuhlman observed that Plaintiff had been doing well in half-time and volunteer work for the Red Cross, and had started a paid part-time job at a telephone call center.  (Id.)   He noted retention of considerable mental residual functional capacity with respect to concentration, persistence, and/or pace.  In particular, Dr. Kuhlman noted that Plaintiff could learn and remember one to two-step instructions, sustain mental effort at significant gainful activity levels of productivity at routine and repetitive tasks, and get along with coworkers, supervisors and the public in short, infrequent, and superficial contacts. (Id.) Dr. Kuhlman observed that there were "no treating

source opinions in file which preclude all work on a mental basis." (Id.)  He noted that "envelope-stuffing is a prototypical job the claimant can do."  (Id.)

On May 10, 2004, disability examiner Carmen M. Nielsen reported, "The medical evidence in file reveals no 'physical' impairment or combination of physical impairments which would preclude the performance of basic work activities. The impairment is not to be considered severe." (Id. at 391.)

On July 23, 2004, Plaintiff met with Dr. Ormiston, who noted that Plaintiff reported feeling fatigued and unable to initiate activities. (Id. at 420.) Dr. Ormiston increased Plaintiff's Adderall dose.  (Id.)  At a follow-up appointment on August 11, 2004, Plaintiff reported that he was overwhelmed, his marriage was falling apart, he tired quickly at his volunteer job, and was unable to return to work or find a new position. (Id. at 491.)

On September 1, 2004, Dr. Richard D. Lentz performed a psychiatric evaluation of Plaintiff, noting problems with short-term memory, fatigue, multitasking, initiation, perseveration, focus, and concentration. (Id. at 475-478.)  Plaintiff mentioned stressors involving his marriage (Id. at 475), and reported problems with sleeping, lethargy, feelings of worthlessness and hopelessness and difficulties with concentration, memory and motivation. (Id. at 476.) Dr. Lentz diagnosed personality change with perseveration and difficulty initiating things secondary to TBI, memory and cognitive loss secondary to TBI, mood disorder secondary to TBI, major depressive disorder, anxiety disorder, and possible ADHD. (Id.) Dr. Lentz assigned Plaintiff a GAF score of 45. (Id. at 478.)  Dr. Lentz opined that Plaintiff could not return to his previous full-time work.  (Id.).  At a follow-up appointment in October, Dr. Lentz noted that Plaintiff was less depressed and irritable.  (Id. at 470.)  He discontinued Plaintiff's Prozac prescription and prescribed Zoloft instead.  (Id. at 471.)

On November 30, 2004, Susan Neuman, an occupational therapist with the Sister Kenney Institute, performed an Occupational Therapy Evaluation. (Id. at 459-60.)  Ms. Neuman reported finding decreased organization, initiation and perseverance. (Id.) While Plaintiff was working 15-20 hours per week on an irregular basis, planning and visual memory remained problems.  At home, Plaintiff reported that he worked on small projects, did laundry, shopped for groceries, drove his son to swimming lessons and helped him with homework.  (Id.)  At a subsequent session in January 2005, Ms. Neuman noted that Plaintiff felt easily overwhelmed and reported continued difficulty with task management, prioritization, and organization. (Id. at 457-58.)

Plaintiff continued treating with Dr. Lentz (see id. at 468; 472), Dr. Rotilie (see id. at 571) and Ms. Neuman (see id. at 453) in the winter of 2005.  Dr. Lentz reported that Plaintiff's private disability coverage had been reinstated in January 2005.  (Id. at 468.)

In March 2005, Dr. John W. Peters diagnosed trigger finger syndrome in Plaintiff's right hand and surgery was performed. (Id. at 432.) On April 11, 2005, Dr. Peters examined Plaintiff and suggested that he could "resume activities as tolerated." (Id. at 431.)  On April 28, 2005, Dr. Gene Lawson diagnosed Plaintiff with carpal tunnel syndrome in Plaintiff's right hand after Plaintiff  "did a bunch of raking for three days straight" a week earlier. (Id. at 430.)

In the spring of 2005, Plaintiff continued to meet with Dr. Ormiston.  (Id. at 416.) Plaintiff reported feeling easily overwhelmed and had difficulty forming thoughts. (Id.)  Around that time, on May 24, 2005, Plaintiff was discharged from treatment at the Sister Kenny Institute. Ms. Neuman of the Sister Kenny Institute indicated that Plaintiff was functionally compensating for his impairments in memory, attention, planning, and fatigue, and she reported he had made progress towards forming organizational strategies. (Id. at 451-452.)  Plaintiff still reported that

he felt disorganized, seemed overwhelmed, and tended to perseverate, although he was working approximately four to six hours a day.  (Id.)

Plaintiff continued to treat with Dr. Lentz and Dr. Rotilie in the summer of 2005 for depression, cognitive loss, mood change and personality change. (Id. at 527; 569.)   Plaintiff reported exhaustion after a few hours of working, as well as anxiety and low energy. (Id. at 527.) Dr. Lentz adjusted Plaintiff's medications, however Plaintiff continued to express a sense of hopelessness and frustration about his future employment and marital problems. (Id. at 526-27.) Also, Plaintiff reported that he had been unsuccessful in his attempt to get a job shelving library books. (Id.)

On August 24, 2005, state agency medical consultant Dr. Chisholm Thomas evaluated Plaintiff using the Physical Residual Functional Capacity Assessment. (Id. at 494-98.)  He determined that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk (with normal breaks) for about six hours in an eight-hour workday, sit (with normal breaks) for six hours in an eight-hour workday, and push and/or pull with limitations in upper extremities.  In addition, Dr. Chisholm found that while Plaintiff could frequently climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, he would be prohibited from climbing ladders, ropes, scaffolds or encountering other hazards. (Id.) Also, Dr. Chisholm concluded that Plaintiff had limited handling (gross manipulation) ability, with the need to restrict frequent gripping and firm grasping. (Id.)

Dr. Lentz continued to treat Plaintiff in the fall of 2005, noting that Plaintiff still reported feeling hopeless, fatigued, overwhelmed, irritable, and depressed with low energy, although Dr. Lentz noted that the medication Adderall was helping. (Id. at 525.) Dr. Lentz indicated that Plaintiff's wife was not very understanding about his brain injury and had declined to learn about

TBI. (Id.) By November 21, 2005, Plaintiff was working at a library approximately two days every two weeks, but was experiencing frustration with this work.  (Id. at 524.) Dr. Lentz diagnosed Seasonal Affective Disorder ("SAD") as a contributing component to depression and prescribed light therapy, and later increased Plaintiff's Cymbalta medication dosage. (Id. At 523-24.)  Plaintiff reported in January 2006 that the light treatment and increased medication had improved his condition, however medical notes indicate that Plaintiff still showed symptoms of depression, including irritability, hopelessness, lack of motivation, fatigue, and feeling overwhelmed. (Id. at 522.)

State agency medical consultant Dr. Sharon Frederiksen completed a Mental Residual Functional Capacity Assessment on March 22, 2006.  (Id. at 530-33.)  She found that Plaintiff was moderately limited in the following areas:  the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting. (Id. at 530-532.)   Dr. Frederiksen remarked that Plaintiff had attained a stable mood with Cymbalta, had marital problems, was working two or more days a week in a library and that Plaintiff felt better working.  (Id. at 532.)  She noted that Adderall had also been a beneficial medication and that Plaintiff's neuropsychology records indicated some limitations in delayed recall, multitasking and frequent task changes.  Also, she indicated that

Plaintiff could not perform his past work, but could do other work. (Id.) Dr. Frederiksen noted that Plaintiff could sustain tasks outside the home, interacted superficially with others and could shop and drive. (Id.)

In reaching a functional capacity assessment, Dr. Frederiksen found that Plaintiff retained sufficient mental capacity to concentrate on, understand and remember routine, repetitive, three-four step instructions that were limited in detail, but that Plaintiff would be markedly limited for multi-detailed or complex, technical instructions. (Id.) She concluded that Plaintiff's ability to carry out routine, repetitive, three-four step tasks with adequate persistence and pace would not be significantly limited, but would be markedly limited for detailed or complex, technical tasks. In addition, Dr. Frederiksen found that Plaintiff's ability to handle co-worker and public contact would be reduced, but adequate to handle brief and superficial contact, but advised against any crowd contact. Likewise, she determined that Plaintiff's ability to handle supervision, would be restricted secondary to reduced stress tolerance but adequate to cope with reasonably supportive supervisory styles that could be expected to be found in customary work settings. Finally, Dr. Frederiksen noted that Plaintiff's ability to handle stress and pressure in the workplace would be reduced, but adequate to handle the stresses of routine, repetitive or three-four step work, however, it would not be adequate for the stresses of detailed or complex work. (Id.)

Dr. Frederiksen also completed a Psychiatric Review Technique form on March 22, 2006. (Id. at 535-48.) She identified organic mental disorders and affective disorders as the categories on which the medical disposition was based. (Id. at 535.) As to organic mental disorders, Dr. Frederiksen indicated that Plaintiff's diagnosis was evidenced by memory impairment and change in personality. (Id. at 536.) She noted also that while Plaintiff's IQ scores were in the high average, his processing speed was slow, his delayed visual recall was

borderline and his auditory skills were average. (Id.) In addition, Dr. Frederiksen indicated that Plaintiff experienced residual depression, possibly due to TBI and marital problems. (Id. at 538.) On the form, Dr. Frederiksen noted that Plaintiff experienced a mild degree of limitation in terms of restrictions on activities of daily living and moderate limitations in maintaining social functions and maintaining concentration, persistence or pace. (Id. at 545.)

Dr. Frederiksen reviewed Plaintiff's medical records, concluding that Plaintiff's mental health contacts and test results did not support the severity of symptoms reported by Plaintiff's wife on a Communicative Activities of Daily Living ("CADL") form. She noted that Plaintiff "appears to sustain tasks when not at home, interacts superficially with others, has a few interests." (Id. at 547.)

On September 14, 2006, Plaintiff consulted with Dr. Ormiston, who reported that he looked worse and a "bit lost." (Id. at 558.) Overall, however, Dr. Ormiston described Plaintiff's condition as "relatively stable in the big picture." (Id.) Dr. Ormiston reported that Plaintiff's wife had moved out of the family home, therefore Plaintiff did "not have the benefit of her helping him keep a bit organized." (Id.) Dr. Ormiston also noted that part-time work was not good for Plaintiff and recommended that he find a job that would impart more structure and organization. (Id.)

On March 13, 2007, Plaintiff again met with Dr. Ormiston. At that time, Plaintiff was working part-time and reported that he had been separated from his wife for one year. (Id. at 564.) Dr. Ormiston noted that Plaintiff's insurers were of the view that Plaintiff's problems were all due to depression or within his control, which seemed "extremely improbable" to Dr. Ormiston (Id.) He continued to prescribe Adderall and recommended that Plaintiff follow-up with his psychiatrist and counselor. (Id.) Plaintiff also met with Dr. Rotilie in the spring of

2007, complaining of mild fatigue and concentration difficulties. Dr. Rotilie continued to prescribe Cymbalta, though at a reduced dose. (<u>Id.</u> at 566; 568.)

On December 6, 2007, medical consultant Dr. David B. Lund completed a Mental Residual Functional Capacity Assessment for Plaintiff. He found Plaintiff had marked limitations in his abilities to relate to co-workers, deal with the public, and interact with supervisors. (<u>Id.</u> at 581-582.) He further rated Plaintiff's ability to deal with work stresses as extremely limited. (<u>Id.</u>) Dr. Lund found that Plaintiff had moderate limitations on his abilities to follow work rules, use judgment, and function independently. (<u>Id.</u>) Dr. Lund also noted Plaintiff's sleeping problems, isolation, poor memory, and poor attention. (<u>Id.</u>) He rated Plaintiff's ability to understand simple and complex job instructions as moderately limited, and he rated Plaintiff's ability to understand and carry out detailed, but not complex, job instructions as markedly limited. (<u>Id.</u>) Dr. Lund wrote, "Patient has trouble with multitasking, dealing with the stresses of job pressures/expectations." (<u>Id.</u> at 582.) On the social side, Plaintiff was judged to have mild limitations in maintaining personal appearance, but marked limitations in behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability. (<u>Id.</u>) Dr. Lund also noted an anger control problem secondary to TBI, which, combined with social issues and isolation, would not allow him to work. (<u>Id.</u>) Dr. Lund concluded that Plaintiff "will be unable to work." (<u>Id.</u>)

On December 7, 2007, Dr. Ormiston completed a Physical Residual Functional Capacity Assessment to determine Plaintiff's physical ability to undertake work-related activities. (<u>Id.</u> at 584-586.) He found that Plaintiff's ability to stand and walk were impaired secondary to fatigue. (<u>Id.</u> at 584.) He also recognized environmental restrictions—heights and moving machinery—for Plaintiff due to his distractibility. (<u>Id.</u> at 585-586.)

### C.    HEARING TESTIMONY

Plaintiff and vocational expert (VE) Julie Harren testified at the December 2007 hearing before ALJ Gatto. No medical expert opinion was offered at the hearing.

#### 1.    Plaintiff's Testimony

Plaintiff testified that he received a bachelor's degree in sociology, a two-year nursing degree, and a master's degree in public health. (Id. at 593.)  He indicated that when he and his family moved into their home in 2002, it required substantial repairs and that his fall from the ladder occurred as he was performing such  work.  (Id. at 596.)  At the time of the hearing, Plaintiff lived alone, stating that he was estranged from his wife, who had moved out of the family home in the summer of 2006.  His fifteen-year-old son stayed with him approximately eight days a month.  (Id. at 593.)

Plaintiff stated he had not worked since March of 2007, after taking an indefinite leave of absence due to the stress of his marital situation.  (Id. at 594.)  Prior to March 2007, Plaintiff had been working for a marketing firm, doing market research over the telephone or in person, on a part-time basis, never more than two days in a row, and never more than six hours a day.  He testified that he did not tolerate noise very well and he found the job very fatiguing, with an erratic schedule.  (Id. at 595.)  In terms of his sources of income, Plaintiff reported that he received $3,000 per month in disability insurance from his former employer and $879.00 per month from a personal disability policy. (Id. at 598.)

To treat his health problems, Plaintiff testified that he was taking Adderall, Synthroid, Cymbalta, baby aspirin, folic acid, Ambien, glucosamine, and Wellbutrin. (Id. at 595-596.)  He stated these certain of these medications involved side effects, specifically noting that Adderall interfered with his sleep. (Id. at 596.)

With respect to daily activities, Plaintiff testified he performed various projects around the house and yard, picked up his son from after-school activities and cooked when his son was visiting. He also cleaned the house, visited doctors, and volunteered on Friday mornings at the public library. (Id. at 596-597.) In terms of yard work, Plaintiff indicated that he looked after his lawn, had planted a bed of roses and was installing fence posts. (Id. at 598.) He added that he has difficulty planning and allotting appropriate amounts of time for these tasks, because his brain gets tired. (Id.) With respect to social support, while Plaintiff had attended group support meetings in the past, he testified that the groups eventually disbanded due to scheduling problems. (Id. at 597.)

Plaintiff identified various examples of memory difficulties that he experiences around the house. For example, Plaintiff reported that he sometimes forgets to eat, take his medication, and return phone calls. (Id. at 599.) He also testified that when cooking, he sometimes realizes that he has forgotten to purchase necessary ingredients and that he may forget to take items out of the microwave or turn off the water. (Id.)

Discussing his medical problems in his own words, Plaintiff described a history of depression, but added that it has primarily been an issue since his fall from the ladder. (Id. at 600.) In addition, he noted that he was diagnosed with ADD and described his general inability to concentrate, as well as an occasional state of over-concentration, in which he focuses on one thing to the exclusion of all others. (Id.) Plaintiff also discussed his mental fatigue and difficulties with organizing, scheduling, initiation, multi-tasking, and decision-making. (Id. at 601, 602.) Physically, he acknowledged that he was capable of lifting up to 50 pounds, but stated that he gets "fatigued, because the brain controls." (Id.)

## 2.      VE's Testimony

The ALJ posed a hypothetical question to VE Harren, asking her to consider a person with the same education and vocational profile as the Plaintiff, with a history of traumatic brain injury with residual depression, personality change, mood disorder, diagnoses of cognitive disorder not otherwise specified, and major depressive disorder. (Id. at 603.)  The person would also have a right trigger finger release, carpal tunnel syndrome on the right hand, and ADD, limiting him to "medium" work with occasional lifting of 50 pounds, frequent lifting of 25 pounds or less, occasional firm gripping or grasping with the right hand (such as in the use of hand tools), and no exposure to unprotected heights or to unprotected dangerous moving machinery. The person would be capable of frequent balancing, stooping, kneeling, crouching, crawling, and climbing of stairs or ramps, but limited to no climbing of ladders, ropes, or scaffolds.  Further, the type of work would be limited to unskilled work, with no rapid or frequent changes in work routine, and with brief and superficial contact with the public, co-workers, and supervisors. (Id. at 603-04.)  The ALJ asked VE Harren if, within those limits, such a person could perform work as a registered nurse, to which VE Harren responded that a person with those limitations could not work as a registered nurse.  (Id. at 604.)

Nevertheless, Ms. Harren testified that a person with the limitations described by the ALJ could find other work in a variety of medium, unskilled jobs in the region, such as assemblers (6,000 jobs in Minnesota), packagers (3,750 jobs in Minnesota), or mixers (2,000 jobs in Minnesota). (Id. at 604-05.)  Plaintiff's counsel asked VE Harren to also add to the limitations presented in the hypothetical that the person has difficulty initiating tasks, such that within three hours he would find it difficult to perform work sufficient for production levels as required by competitive jobs.  (Id. at 606.) VE Harren testified that even with learned compensatory

behaviors, if the worker could not perform routine tasks after a three-hour period, competitive employment would no longer be possible. (Id. at 606.)

The ALJ formulated an alternative hypothetical, asking VE to further limit the restrictions, such that the worker could not engage in brief and superficial contact with the public, co-workers, or supervisors; possessed no ability to deal with work stresses; could not maintain concentration, persistence and pace throughout the eight-hour day, as required; would not be able to follow detailed job instructions; and would not be able to understand, remember, or carry out detailed, but not complex job instructions. In response to the ALJ's question, VE Harren testified that such a person would be unable to work competitively. (Id. at 605.)

### D.    THE ALJ'S DECISION

The ALJ issued an unfavorable decision on March 18, 2008, concluding that Plaintiff was not disabled from May 23, 2002, the date of alleged onset of disability, to the date of the decision. (Id. at 17.) In finding Plaintiff not disabled, the ALJ employed the required five-step sequential evaluation, considering: (1) whether Plaintiff was engaged in substantial gainful activity; (2) whether Plaintiff had a severe impairment; (3) whether Plaintiff's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether Plaintiff was capable of returning to past work; and (5) whether Plaintiff could do other work existing in significant numbers in the regional or national economy. See 20 C.F.R. § 416.920(a)(4).

At step one, the ALJ found that while Plaintiff had intermittently worked in some capacity since the alleged onset of disability, a review of Plaintiff's earnings led the ALJ to conclude that Plaintiff had not engaged in substantial gainful activity since May 23, 2002. (Id. at 18.) The ALJ found at step two that Plaintiff's impairments were severe, consisting of a history of TBI with residual depression; right carpal tunnel syndrome; cognitive disorder, not

otherwise specified; major depressive disorder, recurrent; mood disorder; personality changes secondary to TBI; and ADHD.  (Id.)  The ALJ concluded that Plaintiff's TBI and mental health impairments met the diagnostic criteria for an organic mental disorder and an affective disorder under two separate Listing of Impairments sections.  (Id. at 19.)  In addition, the ALJ found that the objective medical evidence established that Plaintiff's carpal tunnel impairment was a severe impairment.  (Id. at 19.)

At step three, the ALJ considered whether Plaintiff had an impairment or combination of impairments that met or medically equaled one of the listed impairments.  With respect to Plaintiff's physical impairments, the ALJ found that they did not meet the relevant criteria for any listed impairment.  (Id. at 20.)

As to Plaintiff's mental impairments, considered singly and in combination, the ALJ observed that in order to satisfy the listing criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  (Id.)  In activities of daily living, the ALJ found that while Plaintiff's wife had reported that he engaged in few activities of daily living, medical records from treating physicians reported that Plaintiff performed normal household chores with breaks, prepared simple meals, drove a car, spent time with his son, walked, shopped, volunteered at the library, attended group meetings and picked up his son from school.  (Id.)  In addition, the ALJ considered Plaintiff's testimony that he spent time working in his yard, digging a rose bed, tending to the yard and putting up a fence.

As to social functioning, the ALJ found that Plaintiff had moderate difficulties.  He disliked crowds, was unable to work in a noisy environment, had grown angrier since his

accident and, according to his wife, was unaware of social boundaries. Acknowledging numerous references in the record to Plaintiff's marital difficulties, the ALJ noted that Plaintiff had testified regarding social support from his siblings. (Id.) The ALJ also concluded that Plaintiff appeared to be a very concerned and dedicated father. (Id.) The ALJ placed little weight on Plaintiff's September 2004 GAF score of 45, reflective of serious impairments in social, occupational or school functioning, finding it a snapshot of Plaintiff's functioning merely at one point in time, rather than over an extended period. Also, the ALJ considered Plaintiff's history of support group involvement, volunteer work and the lack of any job losses or legal problems due to difficulties with social interaction in the workplace. (Id.)

As to concentration, persistence or pace, the ALJ concluded that Plaintiff had moderate difficulties. He considered Plaintiff's complaints of memory, concentration and attention problems, disorganization, fatigue and difficulty completing projects. (Id. at 21.) Despite Plaintiff's limitations, the ALJ found that Plaintiff was still able to drive a car, keep track of appointments on a Palm Pilot device, which, the ALJ found, would not be possible if Plaintiff were subject to marked limitations in concentration, persistence and pace. In addition, the ALJ noted that records from mental status examinations generally described Plaintiff as alert and oriented, with logical and goal-directed thought processes. In addition, psychological testing revealed a high level of intellectual functioning. (Id.)

Regarding episodes of decompensation, the ALJ noted that Plaintiff had experienced one such episode. (Id.)

Because he found that the Plaintiff's mental impairments did not cause at least two marked limitations, or one marked limitation and repeated episodes of decompensation, the ALJ found that the listing criteria were not satisfied. (Id.)

The ALJ then proceeded to step four where he determined that Plaintiff had the RFC

> to perform medium work . . . requiring lifting fifty pounds
> occasionally and twenty-five pounds or less frequently,
> standing/walking six hours in an eight-hour day, and sitting two
> hours in an eight-hour day, with frequent climbing of stairs and
> ramps, frequent balancing, stooping, kneeling, crouching, and
> crawling, no climbing of ladders, ropes, or scaffolds, no work
> around unprotected heights and unprotected dangerous machinery,
> and occasional firm gripping and grasping with the right hand.
> The claimant is limited to unskilled work with brief and superficial
> contact with coworkers, public, and supervisors and no rapid or
> frequent changes in work routine.

(Id. at 22.)

In assessing Plaintiff's RFC, the ALJ considered Plaintiff's account of his symptoms and

the extent to which they could be accepted as consistent with the objective medical evidence and

opinion evidence. The ALJ found Plaintiff credible in having demonstrated a degree of

functional limitation during the pertinent time period. The ALJ adjusted Plaintiff's RFC

accordingly (e.g., evidence of personality changes and difficulties in working in crowded

situations led the ALJ to limit Plaintiff's RFC to only brief and superficial contact with others).

(Id. at 23.) In addition, the ALJ gave great weight to the opinion of Plaintiff's treating

neurologist, Dr. Ormiston, who opined in December 2007 that Plaintiff's lifting, carrying,

standing, walking and sitting were not affected by his impairment. Rather, Dr. Ormiston's only

limitation related to Plaintiff's need to avoid heights and moving machinery due to

distractibility. Also, the ALJ noted that the RFC was supported by the opinions of other medical

consultants and the lack of any evidence of significant worsening in Plaintiff's condition since

the timing of those evaluations. (Id.)

The ALJ did not find Plaintiff's statements concerning the intensity, persistence and

limiting effects of his symptoms to be credible, finding that Plaintiff's allegations of disability

were not supported by the overall evidence of record.  (Id. at 23.)  The ALJ explained that Plaintiff had recovered well from his May 2002 accident and described daily activities not limited to the extent that one would expect, given the complaints of disabling symptoms and limitations.  The ALJ referenced a neurological evaluation conducted on May 24, 2002, two days after the alleged onset of disability, which revealed only mild to moderate attention deficits, mild deficits in immediate and recent memory and significant difficulty with multi-step directions. (Id.)  The ALJ found it noteworthy that there was no evidence of any acute neurological changes during Plaintiff's May 2002 hospitalization period.  While a June 14, 2002 reevaluation revealed below-average simple visual attention and well below-average verbal fluency, the ALJ noted that Plaintiff displayed significant improvement in many areas, including reasoning ability and memory for verbal and visual material.  (Id. at 24.)  Similarly, while an October 2002 neuropsychological evaluation conducted by Dr. Thompson found below-average to moderate impairment in word fluency, Plaintiff demonstrated high average ability and significant improvement in other areas, including digit span and visual attention.  The ALJ noted that Dr. Thompson concluded that Plaintiff had made a good recovery from his TBI and appeared capable of resuming work at his previous level of functioning.  Moreover, Plaintiff agreed with this assessment and indicated that he looked forward to returning to work.  In light of this evidence, the ALJ observed, "Inconsistent with a finding of disability, Dr. Thompson indicated that no further assessment was necessary and that there was no specific need for any continued neuropsychological rehabilitation."  (Id.)

The ALJ further referenced medical records from 2003 in which Plaintiff underwent a follow-up neuropsychological evaluation with Dr. Cohen.  (Id.)  Dr. Cohen found that Plaintiff demonstrated memory deficits in more complex tasks, but only mild deficits in executive and

speed of processing skills. The ALJ cited to Dr. Cohen's findings that Plaintiff's full scale IQ was at the 91st percentile, reflecting high average intellectual ability, and that while Plaintiff would be precluded from returning to his past work, that he would be able to work at other jobs. Subsequent evidence in the record indicated that Plaintiff's neurologist, Dr. Ormiston, agreed with Dr. Cohen's opinion that Plaintiff was unable to return to his former job, but was able to perform other types of work. (Id.)

The ALJ also found that Plaintiff's allegations of disability due to depression were not supported by the overall evidence of record. (Id.) The ALJ cited to records showing that Plaintiff's overall functioning significantly improved with prescribed medication during his July 2002 psychiatric hospitalization, as evidenced by improvement in his GAF scores between admission (GAF 40) and discharge (GAF 55). Morever, the ALJ noted that other medical records supported the conclusion that Plaintiff's depressive symptoms improved with treatment and medications. (Id.. at 25.) Dr. Thompson noted in October 2002 that Plaintiff had made a good recovery from his depression and that same month, Dr. Yarosh indicated that Plaintiff's overall condition had improved and that from a mood perspective, Plaintiff was not disabled. The ALJ also pointed to Dr. Cohen's October 2003 neuropsychological evaluation, in which Plaintiff acknowledged that his mood was much more upbeat after undergoing group and individual psychotherapy. (Id.) The ALJ found that the medical record indicated ongoing mental health treatment since Plaintiff's alleged onset date, including therapy and medication management. During that time, while Plaintiff's symptoms "waxed and waned," the ALJ observed that the symptoms generally improved with treatment. The ALJ further found that progress notes indicated that a significant portion of Plaintiff's symptoms were situational in nature, relating primarily to his marital problems. (Id.)

In addition, the ALJ found that Plaintiff's actions in volunteering in order to prepare for future employment were inconsistent with a finding of disability. Also, the ALJ gave weight to medical records indicating that Plaintiff's depression was mild (in July 2003, December 2003, January 2004, February 2004), or mild to moderate (in May 2003), and that he was making progress. While acknowledging that Plaintiff reported worsening symptoms in mid-2004, the ALJ cited to medical records showing that Plaintiff's overall functioning improved after his medication was adjusted. (Id.) The ALJ found an October 2004 entry significant, in that Plaintiff reported feeling less depressed and irritable, had fewer feelings of worthlessness and fewer crying spells, was active in two men's groups, a brain injury support group and a church group and was proud of his ability to organize and accomplish things. (Id.)

Also, the ALJ referenced Plaintiff's occupational therapy records from the Sister Kenny Institute indicating that he had demonstrated good follow-through, more initiative in his job search and tolerance for increased hours at his then-current job. (Id.) Plaintiff reported that he was able to plan his activities with his Palm Pilot and was making progress on household projects. The ALJ also noted that Plaintiff indicated that he was working between four to six hours a day by March 2005 and that by January 2006, he reported an improvement in symptoms and was working more at the library, which was helping his mood. According to a September 2006 report from Dr. Ormiston, Plaintiff's overall condition was stable. (Id.)

The ALJ also considered and discounted the December 2007 opinion of Dr. Lund, who opined that Plaintiff was subject to marked limitations in numerous areas. (Id. at 26.) The ALJ did not give Dr. Lund's opinion great weight, finding it inconsistent with the overall evidence of record, including Plaintiff's daily activities and the results of mental status examinations. In particular, the ALJ found Dr. Lund's opinion inconsistent with a February 2005 medication

management progress note which found that Plaintiff's thought processes were logical and goal-directed, his thought content normal and his judgment, insight, short-term and long-term memory intact. The ALJ likewise found that Dr. Lund's opinion that Plaintiff was subject to marked limitations in detailed but not complex instructions to be internally inconsistent with his opinion that Plaintiff was subject to only moderate limitations in complex job instructions. (Id.)

While the ALJ credited Plaintiff with having a good employment record, with earnings consistent with substantial gainful activity during the fifteen years prior to his alleged onset date, the ALJ concluded that Plaintiff's receipt of disability insurance benefits from certain policies might be a disincentive for Plaintiff's return to full-time employment. (Id.)

At step four, the ALJ determined that Plaintiff was unable to perform his past relevant work as a registered nurse, a "heavy, skilled job," as described by Plaintiff, and a "medium, skilled job" as described in the Dictionary of Occupational Titles. (Id.) The ALJ further noted that at the hearing, VE Harren found that a person of Plaintiff's age, education and past work experience, subject to the physical and mental impairments and restrictions set forth above, could not perform any of the Plaintiff's past jobs.

The ALJ then proceeded to step five to determine whether Plaintiff could perform jobs in the national economy. (Id. at 27.) The ALJ considered Plaintiff's RFC and whether he could perform all or substantially all of the exertional demands at a given level of exertion. Based on the testimony of the VE in response to the hypothetical question, which, in relevant part, limited Plaintiff to "medium" work, the ALJ determined that Plaintiff retained the RFC to work as an assembler, packager or mixer, and that such jobs existed in sufficient numbers in the state of Minnesota. (Id.) Based on the VE's testimony, the ALJ concluded that Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national

economy and was therefore not disabled.  (Id.)

## II.    STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). A person is disabled if his physical or mental condition renders that person unable to do not only his previous work, but also other any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d). The impairment must last for a continuous period of not less than twelve months or be expected to result in death. Id.

### A.    ADMINISTRATIVE REVIEW

If a claimant's initial application for benefits is denied, he may request a reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1). A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. Id. at § 404.929. The ALJ must follow a five-step analysis in determining whether a claimant is disabled: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant was capable of returning to past relevant work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy. See 20 C.F.R. § 404.1520(a)–(f). Once the claimant demonstrates his impairments prevent him from performing his previous work, the burden shifts to the Commissioner to prove that jobs exist in the national economy that the claimant could perform. O'Leary v. Schweiker, 710 F.2d 1334, 1337 (8th Cir. 1983).

If the claimant is dissatisfied with the ALJ's decision, he may request review by the

Appeals Council, although review is not automatic. 20 C.F.R. §§ 404.967–404.982. The decision

of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding

upon the claimant unless the matter is appealed to a federal district court within sixty days after

notice of the Appeal Council's action. 42 U.S.C. §§ 405(g); 1383(c)(3); 20 C.F.R. § 404.981.

### B.    JUDICIAL REVIEW

Judicial review of the Commissioner's decision is limited to a determination of whether

the decision is supported by substantial evidence in the record as a whole. Tellez v. Barnhart,

403 F.3d 953, 956 (8th Cir. 2005); Hutsell v. Sullivan, 892 F.2d 747, 748–49 (8th Cir. 1989).

Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support

a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The review is "more than a

mere search of the record for evidence supporting the [Commissioner's] finding." Brand v. Sec'y

of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980). Rather, "the

substantiality of evidence must take into account whatever in the record fairly detracts from its

weight." Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

The reviewing court must review and consider:

1.    The credibility findings made by the ALJ;
2.    The plaintiff's vocational factors;
3.    The medical evidence from treating and consulting physicians;
4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;
5.    Any corroboration by third parties of the plaintiff's impairments; and
6.    The testimony of vocational experts when required, which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Johnson v. Chater, 108 F.3d 942, 944 (8th Cir. 1997) (citing Cruse v. Bowen, 867 F.2d 1183,

1184–85 (8th Cir. 1989)). A court may not reverse the Commissioner's decision simply because

substantial evidence would support an opposite conclusion. Tellez, 403 F.3d at 956; Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). In reviewing the record for substantial evidence, the court may not substitute its own judgment or findings of fact. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm that decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

**III.    DISCUSSION**

Plaintiff argues that substantial evidence does not support the ALJ's conclusions that Plaintiff suffers moderate restrictions in maintaining social functioning and maintaining concentration, persistence or pace.  Rather, Plaintiff argues that the evidence supports a finding that Plaintiff suffers from marked difficulties in these two areas, and is therefore eligible for disability insurance benefits. Alternatively, Plaintiff seeks a rehearing, to include medical expert testimony.  This Court concludes that substantial evidence in the record as a whole supports the ALJ's conclusion and that a rehearing is unnecessary.

In general, for a claimant's mental impairments, either singly or in combination, to meet one of the listed impairments, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation of extended duration.  See 20 C.F.R. pt. 404, subpt. P, app. 1.  Here, the ALJ found that Plaintiff had a mild restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties with concentration, persistence, or pace;

and one episode of decompensation.  (Tr. 20-22.)

### A.    Social Functioning

Social functioning refers to a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C) (2).  Social functioning includes the ability to get along with others, including family members, friends, neighbors, store clerks, landlords and bus drivers.  Id.  A claimant may demonstrate impaired social functioning by showing "a history of altercations, evictions, firings, fear of strangers, avoidance of impersonal relationships, or social isolation." Id.

While Plaintiff argues that his social functioning limitations are "marked," his self-reported activities and the medical record supports the ALJ's conclusion that Plaintiff experienced only moderate difficulties in social functioning.  The ALJ acknowledged evidence showing that Plaintiff experienced distraction around others, difficulties in interpersonal interactions and particular difficulties in his marriage, but the record does not demonstrate a history of altercations, firings, fear of strangers, avoidance of interpersonal relationships or social isolation.  Rather, as the ALJ found, the record reflects that while Plaintiff's marriage was not successful, he maintained a good relationship with his son and siblings, performed volunteer work, had attended various group meetings and had appropriate interactions with his medical providers.  While Plaintiff's providers recommended against him working in an overstimulating environment, none of the doctors found that Plaintiff was unable to get along with others.

The Court finds that the ALJ's rejection of Dr. Lund's opinion that Plaintiff had marked limitations in social functioning was reasonable and supported by the record.  A treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.

House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007).   Id.   Here, in light of evidence regarding

Plaintiff's relationships with his son, siblings and interactions with others in his groups,

volunteer positions, medical encounters and past employment situations, the ALJ was permitted

to discount or reject Dr. Lund's opinion as inconsistent with the other substantial evidence.

### B.      Concentration, Persistence or Pace

Concentration, persistence or pace refer to the ability of a person to sustain focused

attention and concentration sufficiently long to permit the timely and appropriate completion of

tasks commonly found in the workplace.  20 C.F.R. pt. 404, subpt. 4, app. 1, § 12.00 (C)(3).

The Court finds that substantial evidence supports the ALJ's finding that Plaintiff had moderate

difficulties with concentration, persistence or pace.

Neuropsychological testing and therapy following Plaintiff's TBI revealed that Plaintiff

could function at a high level, as documented in an October 2002 report in which Dr. Thomson

concluded, "Mr. Masanz appears to be capable of a high level of functioning across an entire

battery of neurological tests, likely because of good recovery from his traumatic brain injury and

good recovery from his severe depression and anxiety symptoms of this past summer and early

fall."  (Tr. 317.)  Many subsequent examinations, from different treating sources, showed that

Plaintiff was intact, alert and oriented and displayed normal attention, concentration or memory.

(Id. at 224; 341; 466; 470; 472; 478; 525.)  Other records from some of the same treating

physicians, however, noted general problems with concentration (id. at 304-06; 315; 336; 475-

76; 568) or "decreased ability to concentrate." (Id. at 214-15.)  While treating physicians

Thomson, Ormiston, Myers and Cohen agreed that Plaintiff could not return to his former high-

level work as a research nurse, they found that he was capable of performing simpler work and

that he would benefit from working.  (See id. at 209, 266, 317, 408, 558.)  Plaintiff testified that he continued to perform a variety of work around the home as well.

While Dr. Lund concluded in December 2007 that Plaintiff had marked difficulty in maintaining attention and concentration (id. at 581), the mental RFC assessments completed by Dr. Frederiksen in March 2006 and Dr. Kuhlman in May 2004 both concluded that Plaintiff was either not significantly limited or only moderately limited in activities involving sustained concentration and persistence.  (Id. at 530; 369.)   Both Dr. Frederiksen and Dr. Kuhlman agreed that Plaintiff was not significantly limited in performing the following activities involving sustained concentration and persistence: the ability to carry out very short and simple instructions, the ability to sustain an ordinary routine without special supervision, and the ability to make simple work-related decisions.  (Id.)  As to his ability to maintain attention and concentration for extended periods, Dr. Kuhlman indicated that Plaintiff was not significantly limited to moderately limited (id. at 369), while Dr. Frederiksen found him moderately limited. (Id. at 530.)

Although some medical evidence in the record reported poor concentration and attention span limitations, substantial evidence in the record supports the ALJ's finding that Plaintiff's concentration, persistence and pace were moderately limited, as opposed to markedly limited. The RFC assessments of Dr. Frederiksen and Dr. Kuhlman both reached the conclusion that Plaintiff was only moderately limited in activities involving sustained concentration and persistence, and in some areas, was not significantly limited at all.  It is the role of the ALJ, and not this Court, to weigh conflicting evidence and resolve disagreements, see Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007), and the Court concludes that substantial evidence supports the ALJ's conclusion.

Because substantial evidence supports the ALJ's finding that Plaintiff was not disabled, the Court recommends that Plaintiff's Motion for Summary Judgment be denied and Defendant's Motion for Summary Judgment be granted.

## IV. RECOMMENDATION

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. 12), be **DENIED**; and

2.    Defendant's Motion for Summary Judgment (Doc. No. 15), be **GRANTED**.

Dated: January 20, 2011

s/Steven E. Rau
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 4, 2011,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.